The NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE, INC. (NAACP) through its Niagara Falls, New York Branch; Renae Kimble, Political Action Chairperson; Bloneva Bond; Frederick L. Brown; Matthew J. Bushelon; William Feagins; Wayne Galloway; Brenda L. Hamilton; Jay Harris; Homer Hicks, Jr.; Mary Johnson; Joseph Jones; Robert Laster, Sr.; Clinton Palmer; Eddie L. Palmore; Terry Pressley; Jesse Sconiers; Ore Lean Simmons; Charles Towns; Pauline Walker and C. Alonzo Williams [Individually]; Plaintiffs,

v.

The CITY OF NIAGARA FALLS, NEW YORK, a municipal corporation; Michael C. O'Laughlin, Mayor; Guy Tom Sottile; Barbara Geracitano; Anthony Rendina; Henry Buchalski; Michael Gawel; Anthony Quaranto; and Jacob Palillo, members of the Niagara Falls City Council; Elsie Paradise, City Clerk; Defendants.

No. 89–CV–1221S.

United States District Court, W.D. New York.

Sept. 20, 1994.

See also, 65 F.3d 1002.

724

Sylvia Fordice, Fordice & Scott, Buffalo, NY, Dennis Courtland Hayes, Assistant General Counsel, Baltimore, MD, for plaintiffs.

Patrick J. Berrigan, Niagara Falls, NY, for defendants.

## DECISION AND ORDER
SKRETNY, District Judge

### INTRODUCTION

This case arises under the Voting Rights Act of 1965 ("the Act"), 42 U.S.C. § 1973. Plaintiffs are challenging the existing method of electing members to the Niagara Falls City Council, pursuant to Section 2 of the Act, 42 U.S.C. § 1973. Plaintiffs include the National Association for the Advancement of Colored People ("NAACP"), its local Political Action Chairperson Renae Kimble, and nineteen other registered African American voters of the City of Niagara Falls, New York. Defendants include the City of Niagara Falls and its Mayor, the present members of the Niagara Falls City Council, and the Niagara Falls City Clerk.

Under the present method of electing members to the City Council, a method that was approved by a city-wide referendum in 1985, the seven members of the City Council are elected at-large. Plaintiffs object to this system. They demand that this Court enter a declaratory judgment that the present method violates Section 2 of the Act because it results in a denial or abridgement of their right to vote on account of their race. Plaintiffs believe that denial or abridgement is established by a showing that, under the totality of circumstances, the political processes leading to nomination or election to the City Council are not equally open to participation by African Americans in the City of Niagara Falls in that African Americans have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. Plaintiffs demand that this

Court award them injunctive relief by ordering the implementation of a single-member district method of electing members to the City Council, and by requiring that any districting plan include an African American majority-minority district.

A non-jury trial was held before this Court from October 5, 1993, to November 3, 1993. During their case-in-chief, plaintiffs offered testimony from four lay witnesses (plaintiffs Bond, Palmore, Brown, and Kimble), an expert in the area of demographics (Jerry Wilson), an expert historian (Lillian S. Williams), and an expert who testified regarding racial voting patterns and turnout (Michael McDonald). Defendants offered the testimony of ten lay witnesses, including defendant Quaranto and a number of other city officials, and their own expert, who testified regarding voting behavior, elections, and racial voting patterns (Harold W. Stanley).[1] In rebuttal, plaintiffs offered the testimony of an additional expert witness (James W. Loewen). By Order of this Court, Loewen's rebuttal testimony was limited to the issues of (1) Stanley's prediction of plaintiff Kimble's hypothetical success in the 1987 City Council general election; (2) the impact of staggered elections to the City Council on African American voters' ability to elect a representative of their choice; and (3) voter "rolloff" in the 1985 referendum that determined the form of Niagara City government. Lowen's testimony was limited to these issues in light of the evidence presented by the parties during their cases-in-chief, and the probative value of the testimony that plaintiffs expected to elicit from Loewen on rebuttal.

The parties agree that plaintiffs have established the first two of the three prongs necessary to prove a prima facie case under Section 2 of the Act, pursuant to *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Therefore, the only issue

---

1. During trial, examination of the parties' expert witnesses proceeded as follows, at this Court's request. During plaintiffs' case-in-chief, plaintiffs' expert McDonald first testified on direct examination. His testimony was immediately followed by the direct examination of defendants' expert Stanley. McDonald himself was then permitted to ask ten questions of Stanley, and vice

versa. Counsel for defendants then conducted cross-examination of McDonald. Finally, counsel for plaintiffs conducted cross-examination of Stanley. Plaintiffs then continued with their case-in-chief. This Court found this procedure to be very helpful in evaluating the experts' testimony and statistical analyses.

regarding plaintiffs' prima facie case is whether plaintiffs have established the third prong, i.e., whether "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . .—usually to defeat the minority's preferred candidate." *Id.* at 50–51, 106 S.Ct. at 2766–67.

This matter is now before this Court for a final decision on the merits. On the basis of the findings of fact and conclusions of law set forth below, this Court finds in favor of defendants on plaintiffs' claim under Section 2 of the Voting Rights Act.[2]

### FINDINGS OF FACT

#### A. POLITICAL HISTORY OF THE CITY OF NIAGARA FALLS

1. Niagara Falls came into being pursuant to an Act of the New York State Legislature on March 17, 1892, with the union of the Villages of Suspension Bridge and Niagara Falls.

2. Originally, the City Charter provided for a mayor/aldermanic form of government, with the aldermen elected from wards within the city. In 1892, this form provided for eight aldermen, with two elected from each of four wards. The aldermen in each ward served staggered, two-year terms. The Mayor was elected at-large for a one-year term.

3. In 1914, the New York State Legislature enacted the "Optional City Government Law," permitting certain New York cities the option of adopting one of seven different forms of municipal government.

4. In 1915, a referendum was held under which the voters opted for a council/manager plan. Under this plan the Mayor and four councilpersons were elected at-large for four year terms. Terms of office for the Council were staggered, with two councilpersons elected every two years. These five officials served part-time, and comprised the City Council. The Mayor voted equally in Council matters.

5. These five officials appointed a City Manager who ran the day-to-day affairs of the city.

6. This plan of government was in effect until January 1, 1988, a period of 73 years.

7. In 1984 the City created a City Charter Revision Commission composed of seven city residents, including one African American, with instructions to study City government and recommend any changes it deemed appropriate. As a result of this study, and after public hearings, a referendum was held at the general election in November 1985, at which time the electorate was given the option of selecting:

a. A mayor-council form of government with the mayor as the chief executive officer and a seven member council;

b. If a mayor-council form were adopted, whether the seven members of the city council would be elected from seven separate single-member councilmanic districts or at-large;

c. A manager-council form of government with the city manager as the chief executive officer and a six member city council;

d. If a manager-council form were adopted, whether the six members of the city council would be elected from six separate single-member councilmanic districts or at-large.

8. On November 5, 1985 the voters of Niagara Falls voted in favor of a "strong mayor" plan with the seven members of the city council to be elected at-large. This Charter amendment became effective on January 1, 1988. The expanded council and new mayor were elected at the November 1987 general election.

9. Under the present "strong mayor" form of government, the Mayor is the chief executive officer of the City, with veto power over the enactments of a separate legislative branch: the seven member City Council. The day-to-day operations of the City are under the direction of an Administrator, who is appointed by the Mayor. Both the Mayor and Council members are elected to four year terms, with the Council members serv-

---

**2.** During the opening statement of plaintiffs' counsel, plaintiffs dropped their claims under the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution.

ing staggered terms. Councilmanic elections are held every two years.

B. *CANDIDATE SLATING*

1. There are five recognized political parties in the State of New York:
   a. Democrat
   b. Republican
   c. Conservative
   d. Right-to-Life
   e. Liberal

2. A party must receive at least 50,000 votes statewide in the last gubernatorial election to remain on the ballot as a recognized party.

3. The party receiving the greatest number of votes statewide in a gubernatorial election is awarded the top line on the ballot. The party receiving the next highest number of votes receives the second line, etc.

4. The two top lines determine who is seated as commissioner in the County Boards of Elections, and which party nominates the election inspectors who are in the polling places.

5. The New York State Election Law provides the method by which a person qualifies as a primary candidate.

C. *ELECTION OF CITY COUNCILPERSONS*

1. Under the New York State Election Law, if enrolled in a party, except for judicial positions, a candidate may circulate petitions during times designated by the New York State Legislature. A legislative "political calendar" is voted on and established each year by the New York State Legislature.

2. The City Clerk notifies the County Election Commission which seats on the City Council are up for election.

3. A candidate must obtain the signatures of 5% of enrolled voters in the City, established by the number of voters registered as of April 1st each year.

4. The candidate must file the signatures with the County Board of Elections.

5. If not objected to, the candidate is listed on the ballot.

6. If more than one candidate files on a party line, that party holds a primary election, which is usually held in September. The top vote-getter goes on to the general election, which is usually held in November. The top vote-getters, consistent with the number of seats up for election, are declared winners.

7. A voter may vote only in the primary for the party in which he or she is enrolled. However, in the general election voters may vote for any candidate whose name appears on the ballot, and may refrain from voting for any or all candidates.

8. As provided by New York State law, to get on a minor party line a candidate files an acceptance with the minor party. Then, the party chair files an authorization. The candidate then becomes that party's candidate.

D. *POPULATION STATISTICS*

1. In 1900, the City's total population was 19,457 and its total voting age population was 6,476, of whom 153 or 2.26% were African American. From 1900 through 1940, the City's African American population never exceed 1.25% of the total population. In 1940, 975 or 1.25% of Niagara Falls' 77,915 citizens were African American.

2. By 1950, the City's population had grown to 90,872, of whom 3,698 or 4.07% were African American.

3. In the mid 1950's, the Power Authority of the State of New York began construction of the Niagara Power Project, resulting in a significant, but temporary, increase in population and economic prosperity. By 1960, Niagara Falls' population had increased to an all-time high of 102,394, of whom 7,664 or 7.48% were African American.

4. In a special census taken in April 1967, the City's total population had fallen to 88,286, a decrease of 13.8%. The African American population had remained almost static since 1960, at 7,555. A decrease in white [3] population continued in the following years.

---

3. For the purposes of this Decision and Order, "white" can be defined as non-African American.

5. In 1970, the total population of the City was 85,615, of whom 7,959 or 9.3% were African American. Total voting age population was 50,014, of whom 5,029 or 10.06% were African American.

6. In 1980, the total population had dropped to 70,165, while the African American population continued to increase, to 9,079 or 12.94% of the population. Total voting age population was 53,231, of whom 5,362 or 10.07% were African American.

7. In 1990, the total population further decreased to 61,840, of whom 9,634 or 15.58% were African American.

8. According to the 1990 census, the voting age population of Niagara Falls is 47,073, of whom 6,129 or 13.02% are African American.[4]

## E. HISTORY OF ELECTIONS

1. At the time plaintiffs filed this lawsuit in September 1989, no African American had ever been elected to the Niagara Falls City Council.

2. In 1991, Andrew "Andy" Walker, an African American, was a successful councilmanic candidate in the Democratic primary, and was the leading vote-getter in the general election. At the time of trial, he was Chairman of the Niagara Falls City Council.

3. Plaintiffs have analyzed the following referenda and elections in which African American candidates have run:

| Year | African American Candidate | Election and Office |
|---|---|---|
| 1969 | William Abrams | City Council Primary |
| 1971 | Arthur Ray | City Council Primary and General Election |
| 1975 | Joseph Profit | Mayoral Primary |
| 1977 | Joseph Profit | City Council Primary |
| 1977 | George Matthews | City Council Primary |
| 1979 | George Matthews | City Council Primary |
| 1982 | H. Carl McCall | Lt. Governor Primary |
| 1985 | 2 Propositions | Referendum |
| 1987 | Renae Kimble | City Council Primary and General Election |
| 1988 | Jesse Jackson | Presidential Primary |

4. Defendants have analyzed all Councilmanic and Mayoral elections from 1975

through 1991, and the vote on four propositions in connection with the 1985 referenda. Defendants have included in their analysis elections in which no African American candidate has run. Defendants contend that this is acceptable because the Voting Rights Act imposes no requirement that the minority-preferred candidate must be a member of the minority group.

5. Between 90% and 97% of the registered African American voters in the City of Niagara Falls are registered Democrats. Therefore, neither plaintiffs nor defendants have analyzed Republican Party primaries, because virtually no African Americans participated in those elections.

## F. EXPERT METHODOLOGIES

1. Plaintiffs' expert Michael McDonald analyzed elections primarily by using a method of statistical analysis called "simple" bivariate ecological regression analysis. McDonald also employed a method called "extreme case analysis" (also called "homogeneous precinct analysis").[5] Defendants' expert Harold Stanley analyzed elections primarily by using "double" bivariate ecological regression analysis. Stanley used extreme case and simple bivariate ecological regression analyses only as double-checks on his double regression results. To the extent that they analyzed the same elections, the results obtained by McDonald and Stanley did not differ significantly, despite their primary reliance on different statistical methodologies. Moreover, there were no significant differences in results obtained by using the various statistical methods. Because McDonald placed greatest reliance on simple regression, this Court will refer to his results obtained by using that method. Because Stanley placed greatest reliance on double regression, this Court will refer to his results obtained by using that method.

---

The number of non-African American residents of the City of Niagara Falls who are not white (e.g., Mexican Americans, Latin Americans, Asian Americans, and Native Americans) is statistically insignificant for present purposes.

4. The parties have relied on the results of the 1990 census, and have not raised the issue of an

under-counting of minority residents by the Bureau of Census. *See City of New York v. United States Department of Commerce,* 34 F.3d 1114 (2d Cir.1994).

5. As part of his extreme case analysis, McDonald used both simple and complementary percentage analyses.

2. Both bivariate ecological regression analysis and extreme case analysis are standard methods of analyzing racially polarized voting. These techniques produce data concerning the voting patterns of white and African American voters, including estimates of the percentages of voters of each race that voted for particular candidates.

3. Simple bivariate ecological regression analysis, on which McDonald relied, measures a candidate's share of the votes received in a particular election district as a percentage of the number of voters at the polls in that district. That percentage is correlated with the racial composition of the district, measured in terms of percentage of the voting age population in that district. The results for each election district are plotted on a graph. A "correlation coefficient" is generated, demonstrating how consistently voter support for a candidate or group of candidates varies with the racial composition of the election districts. A correlation coefficient of $-1$ or $+1$ indicates a perfect correlation between two variables. Simple regression does not allow for the effects of racial differences in voter turnout; it assumes that turnout rates between racial groups are the same.

4. Double bivariate ecological regression analysis, on which Stanley relied, is a method of ecological regression that does take into account racial differences in turnout rates, and provides an estimate of voter turnout by race. Double regression measures a candidate's share of the votes received in a particular election district as a percentage of the voting age population of the district. That result is then correlated with the racial composition of the district, and the correlation coefficient is generated, as with simple regression. Then, the level of voter turnout by race is obtained by adding the percentages of whites or African Americans among the total voting age population estimated to have voted for each candidate.

5. Although both McDonald and Stanley acknowledged that "double regression" is a method that is generally preferable to "simple regression", McDonald testified that he relied primarily on simple regression because, at least in City Council primaries,

there was no reliable evidence of racially-related differences in voter turnout. Racially mixed districts generally had low voter turnout; however, districts in which African Americans comprised a majority generally had higher turnout rates than the racially mixed districts. In City Council primary elections, McDonald found no significant differences in voter turnout according to race. In general elections, McDonald found that African Americans turned out in fewer numbers than whites. However, plaintiffs did not undertake to analyze comprehensively the significance of these turnout differences. Furthermore, they did not report the turnout differences in elections that they did not analyze themselves.

6. McDonald relied on statistical results obtained by using simple regression, although these results generally provided a "slightly conservative" estimate of racial polarization rates. McDonald measured the degree of racial polarization in elections by calculating the difference between rates of African American cohesion and white crossover voting.

7. Although more than one seat was available for City Council elections, McDonald identified the minority-preferred candidate as the single candidate who received the highest percentage of African American support at the polls. Stanley identified and ranked more than one minority-preferred candidate in such elections. For example, if four seats were available, Stanley ranked the African American voters' four most preferred candidates after identifying the candidates who received the four highest levels of African American support at the polls.

G. *STATISTICAL ANALYSIS OF ELECTIONS*

1. *1969 City Council General Election*

Only plaintiffs analyzed this election, using 1970 census data. Willie Abrams, an African American, ran on a minor party label. In 1969, the City Council was comprised of four members, and two seats were being contested by five candidates. Three of those five candidates had received endorsements from both major and minor parties.

This was not a significantly racially polarized election. Abrams received support from only 23.4% of African American voters and 1.4% of white voters. Plaintiffs did not report the levels of voter support enjoyed by the other candidates.

### 2. 1971 City Council Democratic Primary

Only plaintiffs analyzed this election, using 1970 census data.

Arthur Ray, an African American, ran in the Democratic primary against three other candidates for two available seats. Ray lost the primary. He received support from 92.1% of African American voters and 26.3% of white voters. McDonald calculated a polarization rate of 66%. Plaintiffs did not report the levels of voter support enjoyed by the other candidates.

### 3. 1971 City Council General Election

Only plaintiffs analyzed this election.

Although Arthur Ray lost in the Democratic primary, he ran in the general election on a minor party line. Five candidates ran for two available seats. Three of those five candidates ran on both major and minor party lines. Ray lost the general election. He received support from 78.2% of African American voters and 9.8% of white voters.

### 4. 1975 City Council Democratic Primary

Plaintiffs did not analyze this election because no African American candidate contested.

Seven Democrats ran for two available seats. Gallagher and Battaglia won the election. Defendants' analysis shows that the two preferred candidates of African American voters were Sinclair, who received support from 33.4% of African American voters, and Gallagher, who received support from 31.3% of African American voters. Among white voters, the preferred candidates were Gallagher, who received 42.7% of the white vote, and Battaglia, who received 31.9% of the white vote. Sinclair received support from 24.6% of white voters.

Therefore, because both white and African American voters preferred Gallagher, the election was not significantly racially polarized to the extent that Gallagher won. However, because white voters preferred Battaglia as a second choice and African American voters preferred Sinclair as a first choice, the election was polarized to the extent that Battaglia won and Sinclair lost.

### 5. 1975 City Council General Election

Plaintiffs did not analyze this election because no African American candidate contested.

Seven candidates contested for two available seats. The election was won by the two endorsed Democrats, Gallagher and Battaglia. Both of these candidates were preferred by both white and African American voters. Gallagher received support from 50.2% of white voters and 58.7% of African American voters. Battaglia received support from 42.3% of white voters and 52.5% of African American voters. Therefore, this election was not significantly racially polarized.

### 6. 1977 City Council Democratic Primary

This election was analyzed by both plaintiffs and defendants.

Six candidates contested for two available seats. Two of those six candidates, Profit and Matthews, were African American. Tangent and Martino won the election. Profit and Matthews were preferred by African American voters, but not by white voters. Plaintiffs' simple regression analysis shows that Profit received support from 72.7% of African American voters but only 8.3% of white voters. McDonald calculated a polarization rate of 64%. Defendants' double regression analysis shows that Profit received support from 71.3% of African American voters but only 7.2% of white voters.

Plaintiffs' simple regression analysis shows that Matthews received support from 68.3% of African American voters but only 5.2% of white voters. McDonald calculated a polarization rate of 63%. Defendants' double regression analysis shows that Matthews received support from 65.8% of African

American voters but only 4.4% of white voters.

Plaintiffs did not report the levels of voter support enjoyed by any other candidates.

Defendants' double regression analysis further shows that the candidates preferred by white voters were Tangent, who received support from 47.5% of white voters and 13.1% of African American voters, and Martino, who received support from 44.0% of white voters but virtually no support from African American voters.

Therefore, this election was polarized because Tangent and Martino won the election, whereas Profit and Matthews lost.

### 7. *1977 City Council General Election*

Plaintiffs did not analyze this election because no African American candidate contested.

Five candidates contested for two available seats. Smith and Tangent won the election. Defendants' double regression analysis shows that Martino and Tangent were preferred by African American voters; Smith and Pitarresi were preferred by white voters. Martino received support from 79.5% of African American voters and 39.4% of white voters. Tangent received support from 71.6% of African American voters and 42.3% of white voters. Smith received support from 9.4% of African American voters and 45.4% of white voters. Pitarresi received support from 42.6% of white voters, but virtually no support from African American voters.

Therefore, this election was racially polarized to the extent that the most preferred candidate of white voters won, whereas the most preferred candidate of African American voters lost. It is important to note that African American voters were able to elect Tangent, their second most preferred candidate, despite the fact that Tangent was not one of the two most preferred candidates of white voters.

### 8. *1979 City Council Democratic Primary*

This election was analyzed by both plaintiffs and defendants.

Six candidates contested for two available seats. One of those candidates, Matthews, was an African American. Sottile and Martel won the election; Matthews lost. Matthews and Sottile were preferred by African American voters; Sottile and Martel were preferred by white voters. Plaintiffs' simple regression analysis shows that Matthews received support from 88% of African American voters but only 7.3% of white voters. McDonald calculated a polarization rate of approximately 81%. Plaintiffs did not report the levels of voter support enjoyed by the other candidates.

Defendants' double regression analysis shows that Matthews received support from 97.2% of African American voters but only 6.9% of white voters. The candidates preferred by white voters were Martel, who received support from 41% of white voters, and Sottile, who received support from 35% of white voters. The candidates preferred by African American voters were Matthews, who received support from 97.2% of African American voters, and Sottile, who received support from 11.2% of African American voters. Martel, who received the greatest support from white voters, received virtually no support from African American voters.

Therefore, because both whites and African Americans preferred Sottile, the election was not significantly racially polarized to the extent that Sottile won. However, because whites preferred Martel as a first choice, and African Americans preferred Matthews as a first choice, the election was polarized to the extent that Martel won and Matthews lost.

### 9. *1979 City Council General Election*

Plaintiffs did not analyze this election because no African American candidate contested.

Five candidates contested for two available seats. Bazzoni and Martel won the election. Sottile and Martel were preferred by African American voters; Bazzoni and Martel were preferred by white voters. Defendants' double regression analysis shows that Bazzoni received support from 57.9% of white voters, but virtually no support from African American voters. Martel received support from 47.8% of white voters, and 25.6% of African

American voters. Sottile received virtually unanimous support from African American voters and support from 31.9% of white voters.

Therefore, this election was racially polarized to the extent that the most preferred candidate of white voters won, whereas the most preferred candidate of African American voters lost.

### 10. *1981 City Council Democratic Primary*

Plaintiffs did not analyze this election because no African American candidate contested.

Eight Democrats contested for two available seats. O'Farrell and Rendina won the election. Redding and Tangent were preferred by African American voters; Rendina and O'Farrell were preferred by white voters. Defendants' double regression analysis shows that Rendina received support from 39.0% of white voters but only 2.6% of African American voters. O'Farrell received support from 36.7% of white voters and 30.6% of African American voters. Redding received support from 33.4% of African American voters and 25.3% of white voters. Tangent received support from 33.3% of African American voters and 24.4% of white voters.

Therefore, this election was racially polarized to the extent that white voters were able to elect their preferred candidates (although their first candidate took second place, and vice versa), whereas African American voters were not.

### 11. *1981 City Council General Election*

Plaintiffs did not analyze this election because no African American candidate contested.

Seven candidates contested for two available seats. Smith and Cook, both Republicans, won the election. Smith and Cook were preferred by white voters; O'Farrel and Rendina were preferred by African American voters. Defendants' double regression analysis shows that Smith received support from 51.3% of white voters but virtually no support from African American voters. Cook received support from 45.9% of white voters but virtually no support from African American voters. O'Farrell received support from 73.3% of African American voters and 35.6% of white voters. Rendina received support from 37.3% of African American voters and 42.3% of white voters.

This election was polarized to the extent that the two candidates preferred by white voters won, whereas the two candidates preferred by African American voters lost.

### 12. *1983 City Council Democratic Primary*

Plaintiffs did not analyze this election because no African American candidate contested.

Three Democrats contested for two available seats. Redding and Martel won the election. Redding and Martel were preferred by both African American and white voters. Redding received support from 56.3% of African American voters and 61.1% of white voters. Martel received support from 35.1% of African American voters and 60.3% of white voters.

Therefore, this election was not significantly racially polarized.

### 13. *1983 City Council General Election*

Plaintiffs did not analyze this election because no African American candidate contested.

Four candidates contested for two available seats. Redding and Martel won the election. Redding and Martel were preferred by African American voters; Redding and Bazzoni were preferred by white voters. Defendants' double regression analysis shows that Redding received support from 90.6% of African American voters and 52.3% of white voters. Martel received support from 79.5% of African American voters and 42.1% of white voters. Bazzoni received support from 44.8% of white voters but virtually no support from African American voters.

Therefore, this election was polarized to the extent that Martel, the second most preferred candidate of African American voters, won (as did their most preferred candidate),

whereas Bazzoni, the second most preferred candidate of white voters, lost. It is important to note that white bloc voting in this election was not substantial enough to defeat the minority's second most preferred candidate, whereas it was insufficient to elect white voters' second most preferred candidate.

### 14. *1985 City Council Democratic Primary*

Plaintiffs did not analyze this election because no African American candidate contested.

Six candidates contested for two available seats. Quaranto and Soda won the election. Cook and Soda were preferred by African American voters; Quaranto and Soda were preferred by white voters. Defendants' double regression analysis shows that Cook received support from 50.3% of African American voters and 14.6% of white voters. Soda received support from 35.2% of African American voters and 44.4% of white voters. Quaranto received support from 51.2% of white voters but only 21.9% of African American voters.

Therefore, this election was polarized to the extent that Quaranto, who was the most preferred candidate of white voters, won, whereas Cook, who was the most preferred candidate of African American voters, lost.

### 15. *1985 City Council General Election*

Plaintiffs did not analyze this election because no African American candidate contested.

Seven candidates contested for two available seats. Quaranto and Soda won the election. Quaranto and Soda were the preferred candidates of both African American and white voters. Defendants' double regression analysis shows that Quaranto received support from 50.5% of African American voters and 56.3% of white voters. Soda received support from 46.3% of African American voters and 46.3% of white voters.

Therefore, this election was not significantly racially polarized.

### 16. *1987 City Council Democratic Primary*

Both plaintiffs and defendants analyzed this election.

Nine Democrats contested for five available seats on the City Council, which was enlarged to seven members by the 1985 referendum adopting the new City Charter. Renae Kimble, an African American and a plaintiff in this action, was one of the candidates. This election was won by Sottile, Rendina, Agnello, Buchalski, and Aversa. Kimble lost the election, coming in six votes behind Aversa, out of 45,505 votes cast. Kimble was the most preferred candidate of African American voters, but was not one of the five most preferred candidates of white voters. Plaintiffs' simple regression analysis shows that Kimble received support from 92.2% of African American voters but only 29% of white voters. McDonald calculated a polarization rate of 63.2%. Plaintiffs did not report the levels of voter support enjoyed by the other candidates.

Defendants' double regression analysis shows that Kimble received support from 97.1% of African American voters and 27.5% of white voters. The five most preferred candidates of African American voters were Kimble, Agnello, Rendina, Aversa, and Buchalski; the five most preferred candidates of white voters were Sottile, Rendina, Giove, Buchalski, and Aversa. The support garnered by Kimble has already been discussed. Agnello received support from 29.7% of African American voters and 41.4% of white voters. Rendina received support from 28.7% of African American voters and 49.3% of white voters. Aversa received support from 20.7% of African American voters and 41.8% of white voters. Buchalski received support from 13.8% of African American voters and 43.5% of white voters. Sottile, the candidate most preferred by whites, received support from 52.7% of white voters and 11.7% of African American voters.

Therefore, this election was polarized to the extent that Kimble, who was the most preferred candidate of African Americans, lost by six votes. This Court also notes that Giove, who was the third most preferred candidate of white voters, lost the election.

### 17. *1987 City Council General Election*

Both plaintiffs and defendants analyzed this election.

Eleven candidates contested for five available seats. Kimble, who had lost the Democratic primary election, ran on the Right-to-Life and Liberal party labels. Sottile, Rendina, Geracitano, Buchalski, and Aversa won the election. Plaintiffs' simple regression analysis shows that Kimble received the support of 57.0% of African American voters but only 7.9% of white voters. McDonald calculated a polarization rate of 49%. Plaintiffs did not report the levels of voter support enjoyed by the other candidates.

Defendants' double regression analysis shows that Kimble received support from 77.0% of African American voters but only 8.3% of white voters. The five candidates most preferred by African American voters were Kimble, Agnello, Sottile, Rendina, and Buchalski; the five candidates most preferred by white voters were Sottile, Geracitano, Rendina, Buchalski, and Caso. The support garnered by Kimble has already been discussed. Agnello received support from 38.3% of African American voters and 39.4% of white voters. Sottile received support from 37.9% of African American voters and 51.7% of white voters. Rendina received support from 23.5% of African American voters and 47.1% of white voters. Buchalski received support from 17.2% of African American voters and 45.4% of white voters.

Geracitano received the support of 47.8% of white voters but virtually no support from African American voters. Caso received support from 44.3% of white voters but virtually no support from African American voters.

Therefore, this election was polarized to the extent that Kimble and Agnello, who were the two most preferred candidates of African American voters, lost, whereas all but the fifth most preferred candidate of white voters won.

However, it is important to note here that Kimble testified during trial that she did not actively campaign in the 1987 general election. Furthermore, she suggested that her name remained on the ballot because she had no right to remove it from the Right-to-Life and Liberal Party lines.

It is also somewhat significant that African American votes prevented whites from electing their fifth most preferred candidate.

### 18. *1989 City Council General Election*

Plaintiffs did not analyze this election because no African American candidate contested.

The 1989 City Council Democratic primary was uncontested, there being four Democrats running to fill four available seats. In the general election, eleven candidates contested for four available seats. Quaranto, Gawel, Palillo, and Buchalski won the election. Defendants' double regression analysis shows that the four most preferred candidates of African American voters were Albond, Quaranto, Buchalski, and Aversa; the four most preferred candidates of white voters were Quaranto, Gawel, Palillo, and LaRocca. Albond received support from 58.5% of African American voters and 26.2% of white voters. Quaranto received support from 47.4% of African American voters and 56.1% of white voters. Buchalski received support from 40.8% of African American voters and 40.0% of white voters. Aversa received support from 40.1% of African American voters and 33.6% of white voters.

Gawel received support from 49.8% of white voters but virtually no support from African American voters. Palillo received support from 48.4% of white voters but virtually no support from African American voters. LaRocca received support from 42.8% of white voters but virtually no support from African American voters.

Therefore, this election was polarized to the extent that the two most preferred candidates of white voters won, whereas the two most preferred candidates of African American voters lost. However, it is noted that Buchalski was only able to win because of African American voter support.

### 19. *1991 City Council Democratic Primary*

This election was analyzed by both plaintiffs and defendants.

Five Democrats contested for three available seats. One of those candidates, Andrew Walker, was an African American. At the time of trial, Walker was Chairman of the Niagara Falls City Council, and he is a defendant in this lawsuit. Sottile, Morello, and Walker won the election. Plaintiffs' simple regression analysis shows that Walker received support from 79.4% of African American voters and 38.6% of white voters. McDonald calculated a polarization rate of just under 41%. Plaintiffs did not report the levels of voter support enjoyed by the other candidates.

Defendants' double regression analysis shows that Walker received support from 85.7% of African American voters and 37.6% of white voters. The three most preferred candidates of African American voters were Walker, Rendina, and Sottile; the three most preferred candidates of white voters were Sottile, Morello, and Aversa. The support garnered by Walker has already been discussed. Rendina received support from 14.9% of African American voters and 41.8% of white voters. Sottile received support from 9.1% of African American voters and 58.5% of white voters. Aversa received support from 43.6% of white voters and 4.6% of African American voters.

Therefore, this election was polarized to the extent that the second most preferred candidate of African American voters lost, whereas the second most preferred candidate of white voters won. It is noted, however, that the third most preferred candidate of African American voters won, whereas the third most preferred candidate of white voters lost.

20. *1991 City Council General Election*

Both plaintiffs and defendants analyzed this election.

Nine candidates, including Walker, contested for three available seats. Walker, Sottile, and Geracitano won the election. Plaintiffs' simple regression analysis shows that Walker received support from 84.8% of African American voters and 42.9% of white voters. McDonald calculated a polarization rate of approximately 41%. Plaintiffs did not

report the levels of voter support enjoyed by the other candidates.

Defendants' double regression analysis shows that Walker received virtually unanimous support from African American voters and support from 43.2% of white voters. The three most preferred candidates of African American voters were Walker, Sottile, and Morello; the three most preferred candidates of white voters were Geracitano, Sottile, and Walker. The support garnered by Walker has already been discussed. Sottile received support from 45.7% of African American voters and 45.1% of white voters. Morello received support from 35.4% of African American voters and 38.3% of white voters.

Geracitano, who was the candidate most preferred by white voters, received support from 45.3% of white voters but virtually no support from African American voters.

Therefore, this election was polarized to the extent that the third most preferred candidate of African American voters lost, whereas all three of the most preferred candidates of white voters won.

21. *1975 Mayoral Democratic Primary*

Both plaintiffs and defendants analyzed this election.

Three Democrats contested, including Profit, an African American. O'Laughlin won the election. Profit was the candidate most preferred by African American voters; O'Laughlin was the candidate most preferred by white voters. Plaintiffs' simple regression analysis shows that Profit received support from 47.4% of African American voters but only 1.4% of white voters. McDonald calculated a polarization rate of 46%. Plaintiffs did not report the levels of voter support enjoyed by the other candidates.

Defendants' double regression analysis shows that Profit received support from 50.5% of African American voters but only 1.7% of white voters. O'Laughlin received support from 65.3% of white voters and 22.9% of African American voters. The third candidate, Sottile, received support from 19.3% of African American voters and 28.1% of white voters.

Therefore, this election was racially polarized to the extent that O'Laughlin, the most preferred candidate of white voters, won, whereas Profit, the most preferred candidate of African American voters, lost. However, based on plaintiffs' analysis, Profit was preferred by African American voters only by a plurality, rather than by a majority.

### 22. *1975 Mayoral General Election*

Plaintiffs did not analyze this election because no African American candidate contested.

Three candidates contested, and O'Laughlin won. O'Laughlin was the most preferred candidate of both African American and white voters. He received support from 78.4% of African American voters and 56.5% of white voters.

Therefore, this election was not significantly racially polarized.

### 23. *1979 Mayoral Democratic Primary*

Plaintiffs did not analyze this election because no African American candidate contested.

Two Democrats contested, and O'Laughlin won the election. O'Laughlin was the candidate preferred by both African American and white voters. He received support from 54.1% of African American voters and 56.2% of white voters.

Therefore, this election was not significantly racially polarized.

### 24. *1979 Mayoral General Election*

Plaintiffs did not analyze this election because no African American candidate contested.

Two candidates contested, and O'Laughlin won the election. O'Laughlin was the candidate preferred by both African American and white voters. He received support from 95.2% of African American voters and 50.5% of white voters.

Therefore, this election was not significantly racially polarized.

### 25. *1983 Mayoral General Election*

Plaintiffs did not analyze this election because no African American candidate contested.

No Democratic primary took place in 1983, because O'Laughlin was uncontested for the Democratic nomination. In the general election, two candidates contested, and O'Laughlin won the election. O'Laughlin was the candidate preferred by both African American and white voters. He received support from 89.7% of African American voters and 54.0% of white voters.

Therefore, this election was not significantly racially polarized.

### 26. *1987 Mayoral Democratic Primary*

Plaintiffs did not analyze this election because no African American candidate contested.

Four Democrats contested, and O'Laughlin won. Massaro was the candidate most preferred by African American voters; O'Laughlin was the candidate most preferred by white voters. Defendants' double regression analysis shows that Massaro received support from 33.1% of African American voters and 31.6% of white voters. O'Laughlin received support from 28.6% of African American voters and 35.5% of white voters.

Therefore, this election was racially polarized.

### 27. *1987 Mayoral General Election*

Plaintiffs did not analyze this election because no African American candidate contested.

Four candidates contested, and O'Laughlin won. O'Laughlin was the candidate most preferred by both African American and white voters. O'Laughlin received support from 66.9% of African American voters and 50.3% of white voters.

Therefore, this election was not significantly racially polarized.

### 28. *1991 Mayoral Democratic Primary*

Both plaintiffs and defendants analyzed this election.

Three Democrats contested, including plaintiff Renae Kimble. Quaranto won the election. Kimble was the candidate most preferred by African American voters; Quaranto was the candidate most preferred by white voters. Plaintiffs' simple regression analysis shows that Kimble received support from 93.9% of African American voters but only 8.1% of white voters. McDonald calculated a polarization rate of approximately 85.8%. Plaintiffs did not report the levels of voter support enjoyed by the other candidates.

Defendants' double regression analysis shows that Kimble received virtually unanimous support from African American voters but support from only 6.1% of white voters. Quaranto received support from 61.0% of white voters but virtually no support from African American voters.

Therefore, this election was racially polarized.

### 29. 1991 Mayoral General Election

Plaintiffs did not analyze this election because no African American candidate contested.

Four candidates contested, and Palillo won. Quaranto was the candidate most preferred by African American voters; Palillo was the candidate most preferred by white voters. Defendants' double regression analysis shows that Quaranto received support from 89.9% of African American voters and 44.4% of white voters. Palillo received support from 52.3% of white voters but virtually no support from African American voters.

Therefore, this election was racially polarized.

### 30. 1982 New York State Lieutenant Governor Democratic Primary

Only plaintiffs analyzed this election.

H. Carl McCall, an African American, was a candidate. Plaintiffs' simple regression analysis shows that McCall was the candidate most preferred by African American voters. McCall received support from 96.7% of African American voters and 36.8% of white voters.

Therefore, this election was racially polarized.

### 31. 1988 Presidential Primary

Only plaintiffs analyzed this election.

Jesse Jackson, an African American, was a candidate. Plaintiffs' simple regression analysis shows that Jackson received virtually unanimous support from African American voters but support from only 13.6% or 10.9% of white voters, depending upon whether total population or voting age population figures are used.

Therefore, this election was racially polarized. McDonald calculated a polarization rate of approximately 89%.

### 32. 1985 Referenda

As indicated above, voters were given the opportunity to choose from among four options in revising the Niagara Falls City Charter, or to maintain the status quo. Plaintiffs analyzed only the choice between a mayoral or "city manager" form of government with City Council members chosen from single-member districts. Plaintiffs' simple regression analysis shows that 67.6% of African American voters and 40.3% of white voters voted in favor of a "strong mayor" form of government with seven councilmanic districts. Plaintiffs' analysis further shows that 47.2% of African American voters and 28.5% of white voters voted in favor of a "strong city manager" form of government with six councilmanic districts. McDonald testified that he could not confidently say that significant racial polarization was evident in this last voting pattern.

Defendants analyzed all the propositions on the 1985 referendum. Defendants' double regression analysis shows that 56.1% of white voters and 4.4% of African American voters voted in favor of a mayor-council form of government with at-large representation, whereas 27.3% of white voters and 14.2% of African American voters voted in favor of a "strong mayor" form of government with seven councilmanic districts. 13.0% of white voters and 4.8% of African American voters voted in favor of the city manager form of government with at-large representation, and

17.5% of white voters and 3.9% of African American voters voted in favor of the city manager form of government with six councilmanic districts.

### H. *PRIMA FACIE CASE OF VOTE DILUTION*

*Size and Geographic Compactness of Minority Group*

1. The parties do not contest the fact that the African American community in the City of Niagara Falls is sufficiently large and geographically compact to comprise an effective majority-minority district in a hypothetical single-member district system.

2. Plaintiffs introduced the expert witness testimony of Jerry Wilson, a demographer. Using 1990 census data, Wilson showed that the City of Niagara Falls has a total population of 61,856, and a total African American population of 9,634. The City's total voting age population is 47,073, and African American voting age population is 6,129. The City's African American voting age population constitutes approximately 13% of the total voting age population. Approximately 30% of the African Americans in the City of Niagara Falls live in census tract 202. Positing a hypothetical seven-member City Council elected from seven single-member districts, Wilson calculated that an ideal election district would be comprised of a total population of 8,834.

3. Using plaintiff's exhibit 19, Wilson showed that a viable and geographically compact African American majority-minority district could be created, primarily out of census tract 202. The district would contain a total population of 8,394, which would deviate by approximately 4.98% from the population of an ideal district. The district would contain a total voting age population of 5,434. The district would have a total African American population of 5,400, constituting 64.33% of the district's total population. The district would have a total African American voting age population of 3,291, constituting 60.56% of the district's total voting age population.

4. Therefore, plaintiffs have met the first prong of *Gingles*.

5. However, as defendants note, before the size of the City Council was increased from four to seven in 1987, no viable African American majority-minority district could have been designed. Furthermore, using defendants' exhibit FF, defendants illustrated that, according to 1980 census figures, plaintiffs could create a majority-minority district with only a 50.22% African American voting age population. Furthermore, the hypothetical district would not be geographically compact. These circumstances diminish the probative value of plaintiffs' analysis of pre–1987 elections.[6]

6. In addition, plaintiffs' own expert witnesses testified that the at-large electoral system normally cannot be shown to be responsible for a minority group's inability to elect candidates of its choice until the minority population in the jurisdiction reaches approximately 10–15% of the total population. *See Gingles*, 478 U.S. at 50, 106 S.Ct. at 2766 (If minority group is not sufficiently large and geographically compact to constitute a majority in a single-member district, "the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates.") (emphasis in original). However, the stipulated facts in this case demonstrate that the census data pertaining to the year 1971 show that African Ameri-

---

**6.** Plaintiffs argue that the relevance of pre–1987 elections should not be diminished in making an ultimate determination of whether any lack of African Americans' success at the polls has been caused by the at-large City Council system. Plaintiffs suggest that the four-member City Council form of government may itself have violated the Act, and that it would likely have been possible for them to have sued the City on that basis. In one respect, this Court is inclined to consider the possibility that the four-member City Council scheme had a discriminatory effect on African American voters. However, in *Holder v. Hall*, —— U.S. ——, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994), the Supreme Court recently held that "a plaintiff cannot maintain a § 2 challenge to the size of a government body...." *Id.* at ——, 114 S.Ct. at 2588. Therefore, elections that occurred before the *present* seven-member City Council election scheme was established are of considerably less relevance than elections that took place thereafter, in resolving the ultimate issue in this case: whether the *present* seven-member system has a discriminatory effect on the voting rights of African American residents of Niagara Falls.

cans comprised only 9.3% of the population of the City of Niagara Falls in that year. Therefore, by plaintiffs' own estimation, the 1971 elections analyzed by plaintiffs are of marginal probative value in determining whether African American voters have been unable to elect their representatives of choice as a result of the present form of government.

*Political Cohesiveness of African Americans in the City of Niagara Falls*

1. The parties agree that plaintiffs have shown that African Americans have been politically cohesive in their voting patterns.

2. Political cohesiveness is demonstrated in the present case regardless of whether this Court considers only elections in which an African American candidate has contested, or whether it considers all the elections analyzed by the parties.

3. Using simple regression analysis, McDonald demonstrated that, with the exceptions of the Willie Abrams candidacy in the 1969 City Council election and the Joseph Profit candidacy in the 1975 Mayoral election, African American voters cast a substantial majority of their votes for African American candidates when African American candidates were on the ballot.[7]

4. Using double regression analysis, Stanley found that "a significant number of minority group members usually vote for the same candidates" or propositions. *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769.

5. Therefore, plaintiffs have met the second prong of *Gingles.*

*Third Prong of Gingles*

1. After reviewing the parties' analyses of elections in the City of Niagara Falls, this Court concludes that plaintiffs have not met their burden of showing that the white majority in Niagara Falls "votes sufficiently as a bloc to enable it—in the absence of special circumstances . . .—usually to defeat the minority's preferred candidate." *Gingles,* 478 U.S. at 51, 106 S.Ct. at 2766–67.

2. Plaintiffs undertook to meet their burden of proof with regard to this prong by analyzing certain elections in an attempt to demonstrate which single candidate would have won each election in a hypothetical African American majority single-member district. However, assuming the validity of that approach, plaintiffs' analysis did not extend to elections in which no African American candidate contested. *But see Citizens for a Better Gretna v. City of Gretna,* 834 F.2d 496, 502 (5th Cir.1987), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989) ("In a multiple seat election . . . the minority necessarily will have more than one preferred candidate."); *Valladolid v. City of National City,* 976 F.2d 1293 (9th Cir.1992); *Clarke v. Cincinnati,* 1993 WL 761489 (S.D.Ohio 1993).

Therefore, plaintiffs failed to analyze the City Council Democratic primary elections for the years 1975, 1981, 1983, and 1985; and the City Council general elections for the years 1975, 1979, 1981, 1983, 1985, and 1989. Moreover, plaintiffs failed to analyze the mayoral Democratic primaries for the years 1979 and 1987; and the mayoral general elections for the years 1975, 1979, 1983, 1987, and 1991.

3. By declining to analyze these elections, plaintiffs provided this Court with no indication of which candidates would have won these elections if they had taken place in a hypothetical, African American majority, single-member district. Moreover, this Court cannot determine itself which candidates would have won those elections, because such a determination depends upon complicated mathematical formulae, and requires expert analysis and testimony. Therefore, plaintiff's have simply failed to meet their burden of proof at trial in this regard.

4. When all of the elections analyzed by plaintiffs and defendants are considered, the proof shows that, on the whole, the white majority population in the City of Niagara Falls does not vote in such a way that it usually defeats the African American voters' candidate of choice.

5. In recent elections, African Americans have been particularly successful in electing their candidates of choice.

---

7. See Appendix A, which is taken from plaintiffs' exhibit 25–F, Pl Ex 25–6.

6. In reviewing the elections analyzed by the parties, this Court has paid particular attention to recent elections for seats to the Niagara Falls City Council. This is especially appropriate because of the diminished relevance of the 1971 and pre–1987 elections for the reasons discussed above.

7. Particularly relevant to this Court's analysis is the fact that African American voters' candidate of choice in the 1991 City Council Democratic primary and general elections, Andrew Walker, won those elections. Although these victories were obtained after this lawsuit was filed, this Court finds insufficient evidence in the record to conclude that their significance should be minimized. Specifically, plaintiffs have failed to persuade this Court that these victories were the result of an attempt by white voters to "humiliate" this lawsuit.[8] Furthermore, African Americans succeeded in electing their "second choice" candidate, Sottile, in the 1991 City Council general election, and their "third choice" candidate, Sottile, in the 1991 City Council Democratic primary. Although minority success in one or a few elections does not *per se* foreclose a vote dilution claim, see *Gingles,* 478 U.S. at 55–59 and n. 25, 106 S.Ct. at 2769–70 and n. 25, these elections are highly relevant because they are recent, and because they involve the Niagara Falls City Council.

8. In the 1989 City Council general election, African Americans succeeded in electing two of their four most preferred candidates, Quaranto and Buchalski. They were able to elect Buchalski despite the fact that he was not one of the four most preferred candidates of white voters.

9. In the 1985 City Council general election, African American voters were successful in electing their two preferred candidates, Quaranto and Soda, to the two available seats on the City Council. In the 1985 City Council Democratic primary election, African American voters were able to elect one of their two preferred candidates.

10. It is also somewhat significant that Renae Kimble, who was the African American voters' candidate of choice in the 1987 City Council Democratic primary, lost by only six votes. Although she lost in the 1987 City Council general election—an election that was analyzed by plaintiffs in support of their claims—the significance of her loss must be minimized by the fact that she chose not to campaign actively in that election.

11. Plaintiffs were unable to prove to this Court's satisfaction that Renae Kimble would not have won the 1987 City Council general election under the at-large scheme if she had run on the Democratic Party line, due to unresolvable conflicts between the statistical approaches taken by Professors Loewen and Stanley. This diminishes plaintiffs' proof that the at-large system made a difference in this election because Kimble would have won the election if she had run in an African American majority, single-member district.

12. In the 1987 City Council general election, African American voters were successful in electing three out of five of their most preferred candidates. In the 1987 City Council Democratic primary, they were able to elect four out of five of their most preferred candidates.

13. As noted above, the relevance of the 1971 elections analyzed by plaintiffs are of diminished significance, due to the fact that at that time African Americans constituted only 9.3% of the total population of the City of Niagara Falls.

14. Similarly, as noted above, the relevance of the pre–1987 City Council primaries and general elections analyzed by plaintiffs are of diminished significance, due to the fact that, prior to the City Charter amendment after the 1985 referendum, the City Council was comprised of only four members. Plaintiffs' expert agreed that it would not have been possible to form an African American majority single-member district at that time.

---

**8.** See *Zimmer v. McKeithen,* 485 F.2d 1297, 1307 (5th Cir.1973), *aff'd sub nom., East Carroll Parish Sch. Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) ("[W]e cannot endorse the view that the success of black candidates at the polls necessarily forecloses the possi-bility of dilution of the black vote.... [S]uch success might be attributable to political support motivated by different considerations—namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution grounds.").

*See Gingles*, 478 U.S. at 50, 106 S.Ct. at 2766 (If minority group is not sufficiently large and geographically compact to constitute a majority in a single-member district, the multimember or at-large system being challenged "cannot be responsible for minority voters' inability to elect its candidates."). Therefore, if this litigation had taken place before 1985, i.e., before the change in the size of the City Council, plaintiffs would have been unable to prevail under the first prong of *Gingles*.

15. Plaintiffs specifically did not undertake to determine whether any of the successful candidates in elections in which no African American candidate contested was the candidate of choice of African American voters. Moreover, plaintiffs chose not to report on the levels of support enjoyed by any candidates other than African American candidates. As discussed below in this Court's conclusions of law, this Court has determined that it should not categorically refuse to consider elections in which no African American candidate contested. Plaintiffs' failure to analyze these factors significantly limits the breadth and therefore the persuasiveness of plaintiffs' proof.

16. Plaintiffs' expert McDonald analyzed the effects of African American voter cohesion and racially polarized voting by forecasting who would have won each of the elections that he analyzed in an African American majority single-member district.[9] Defendants have strenuously attacked that type of analysis, arguing that it necessarily injects a plethora of hypothetical conditions and candidates.[10] In any event, McDonald failed to report any forecasts involving elections in which no African American candidate contested at-large. This failure further diminishes the strength of plaintiffs' analysis, especially because defendants have considered all of these elections in their analysis.

9. McDonald's single-member district forecasts are attached as Appendix B, which is taken from plaintiffs' exhibit 25–F, Pl Ex 25–9.

10. See also, Plaintiffs' Post Trial Brief, p. 13, where plaintiffs write, "From either plaintiffs' or defendants' perspective, the critically important point is the determination of whom the black voters' candidates of choice have been in each of a variety of contexts (e.g., black/white, white/

17. After reviewing the results of all the elections analyzed by the parties, and after according them varying degrees of weight, as described above and below in this Court's conclusions of law (including added weight, where appropriate, to elections in which an African American candidate has contested), this Court finds that plaintiffs have not met their burden of proving that the white majority in Niagara Falls "votes sufficiently as a bloc to enable it—in the absence of special circumstances . . .—usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766–67.

I. *SENATE REPORT FACTORS—THE TOTALITY OF CIRCUMSTANCES*

*History of Official Discrimination*

1. "Proving a history of official discrimination is in most cases not difficult. The social science expertise that is most relevant is, of course, that of the historian.... It is useful ... to take the history as close to the present as possible. Because de jure segregation will have ended some time ago, this can be done in part by tracing official positions or legal resistance to various race-related situations that have resulted in court-imposed solutions." Bernard Grofman, Expert Witness Testimony, in Controversies in Minority Voting, 202–03, (Bernard Grofman et al. eds., 1992).

2. "Evidence of statewide policies of discrimination, while often sufficient, has frequently been supplemented with evidence specific to a given polity—segregated private clubs and other forms of social segregation participated in by local political officials, for example, or segregated housing patterns buttressed by red lining, or historical use of restrictive covenants. Of particular relevance is evidence on barriers to voting participation and registration (for example, few bilingual registrars, few minority poll watch-

white, and finishing in 2nd, 3rd, 4th, or 5th place)." This observation, which recognizes the "vote-for-many" format of elections to the Niagara Falls City Council, appears to be inconsistent with McDonald's exclusive focus on projecting in each election who the single, top vote-getter would have been in an African American majority single-member district.

ers and election officials, or polling precincts located disproportionally in white Anglo areas). Some of this data can be established from polling maps, property deeds, litigation dockets, court records, and census data, but some can be introduced only through the testimony of knowledgeable local citizens." *Id.*, at 203.

3. In the present case, plaintiffs introduced the testimony of an expert historian, Lillian Williams. Ms. Williams is a professor of history in the department of women's studies at the State University of New York at Albany. Williams was asked by plaintiffs to ascertain whether there exists a history of official discrimination against African Americans in New York State or any of its subordinate jurisdictions to determine the impact of any such history on the voting rights of African Americans. Plaintiffs introduced her testimony as relevant to the present Senate Report factor, as well as the Senate Report factor concerning the extent to which African Americans bear effects of discrimination in other areas that affect their ability to participate effectively in the political process.

4. In anticipation of her testimony, Williams reviewed copies of newspaper articles from the *Niagara Gazette,* the depositions of plaintiffs and defendants, NAACP papers, one commission report of the State of New York (the 1937 Report of Urban Colored People of the State of New York), a number of books dealing with minority concerns and conditions, and the results of personal interviews she conducted with residents of Niagara Falls.

5. It is necessary at this point for this Court to make some observations about the weight it attributed to Williams' testimony, in light of her research methods and the bases on which she formed her conclusions about official and unofficial discrimination perpetrated against African American residents of the City of Niagara Falls.

6. Although each piece of Williams' testimony was separately considered, this Court did not generally attribute much weight to her conclusions and opinions for the following reasons. First, her analysis of conditions in Niagara Falls stopped at approximately 1980. Therefore, although her testimony was at times relevant to show a pattern of discrimination against African Americans in certain aspects of life, it was not particularly relevant in demonstrating whether those patterns persist, or in showing the lingering effects of those patterns. Second, this Court is skeptical of some of the conclusions reached by Williams because of the bases on which she formed those conclusions. For instance, although Williams relied on the 1937 report mentioned above, her reliance was based only on the testimony of one witness at the hearings that resulted in that report. Williams admitted during cross-examination that she knew essentially nothing about the witness on whose testimony she relied. Williams also relied heavily on personal interviews. Such interviews "can be important in providing flesh and substance to the rather bloodless and abstract reports commonly provided by social scientists and in reminding the court that judicial decisions will affect the lives of real people." *Id.,* at 203 n.14. However, Williams' interviewees were in many instances the plaintiffs themselves. Others interviewed by Williams included her family members and friends. Williams kept no notes of many interviews. Although Williams testified that these methodologies are used by historians such as herself, this Court found that much of her testimony deserved little weight. Finally, Williams admitted that she was unable to find any authoritative literature discussing the plight of African Americans in the City of Niagara Falls itself. The 1937 report upon which she relied addressed conditions in New York State generally, and not Niagara Falls in particular. Williams relied on other books and documents that did not specifically address conditions in Niagara Falls. In some cases, Williams merely inspected newspaper articles of commission reports, rather than the reports themselves.

7. Plaintiffs introduced exhibit AAA, Williams' three-page preliminary report on conditions in Niagara Falls, which she completed in August 1992. Williams never modified that report. This Court has attributed virtually no weight to that report, due to its conclusory, unsupported analysis.

8. At the conclusion of her testimony, Williams stated that she was vehemently opposed to at-large councilmanic districts under any conditions. This Court has reviewed Williams' testimony in light of that testimony.

9. Plaintiffs introduced no significant evidence of historical official discrimination against African Americans in the City of Niagara Falls that touched upon African Americans' right to vote, register to vote, or otherwise participate in the political process. Plaintiffs testified that they never encountered difficulties in voting, registering to vote, or forwarding themselves as candidates for election, and knew of no instances in which others encountered difficulties.[11]

10. In the first half of the nineteenth century, African American schoolchildren were barred from attending white schools. "African schools" were established to accommodate African American schoolchildren. However, in 1891 this practice was forbidden by the courts, and by 1905 the African schools had been eliminated.

11. There is some indication that during the 1950's and 1960's minority residents of Niagara Falls were steered toward certain city housing developments. The proof on this issue was limited, and plaintiffs offered no evidence indicating the duration of any such practices. Furthermore, as will be discussed below, the City of Niagara Falls has taken affirmative steps to address disparities in housing conditions between white and minority residents.

*Extent of Racially Polarized Voting*

1. In general, elections in which at least one African American candidate contested were marked by a high degree of racial polarization. The 1969 City Council general election, in which Abrams, an African American, ran was not marked by significant racial polarization. However, in five of the six municipal elections between 1971 and 1979 involving an African American candidate, less than 10% of white voters supported the African American voters' candidate of choice. During that same time period, with the exception of the 1975 Mayoral Democratic primary, the African Americans voters' candidate of choice received support from at least two thirds of African American voters. Considering the fact that in many of these elections voters could vote for more than one candidate, these polarization rates are quite high.

2. Since 1987, elections in which at least one African American candidate contested have been marked by more varied levels of racial polarization. In the 1987 City Council Democratic primary, Kimble received support from approximately 92% of African American voters and between 29% and 30% of white voters. In the 1987 City Council general election, Kimble received support from between 57% and 77% of African American voters but only approximately 8% of white voters. (Note that in this election Kimble chose not to campaign actively.) In the 1991 City Council Democratic primary, Walker received support from approximately 79% of African American voters and approximately 39% of white voters. In the 1991 general election, Walker received anywhere from 84.8% to virtually unanimous support from African American voters and approximately 43% of white voters. As noted above, Walker won, and the racial polarization did not prevent the African American voters' candidate of choice from winning either the primary or general election.

In the 1991 Mayoral Democratic primary, Kimble received support from approximately 91.3% to 93.9% of African American voters but only 8.1% of white voters. Although there still exist substantial differences in voting patterns according to race, these rates generally indicate a recent decrease in the degree of racial polarization.

---

11. *See Whitcomb v. Chavis*, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971), in which the Supreme Court wrote:

We have discovered nothing ... indicating that [African Americans] were not allowed to register or vote, to choose the political party they desired to support, to participate in its affairs or to be equally represented on those occasions when legislative candidates were chosen. Nor did the evidence purport to show or the court find that inhabitants of the ghetto were regularly excluded from the slates of both major parties, thus denying them the chance of occupying legislative seats.

3. This Court does not observe the same overall degree of racial polarization when it considers all of the elections analyzed, including those elections in which no African American candidate contested. Neither plaintiffs nor defendants undertook to summarize conveniently all the polarization rates for these elections. However, this Court has reviewed the voter support for all the candidates who contested the municipal elections analyzed that took place between 1969 and 1991. This Court has also reviewed the correlation coefficients that pertain to these elections. After doing so, it is evident that, at least where no African American candidate contests, there is generally no legally significant pattern of racial polarization according to *Gingles*.

4. Although this Court has commented on the varying degrees of racial polarization depending upon which elections are analyzed, it must be noted that in *Gingles* a majority of the Supreme Court explained that racial polarization (also referred to by the Court as "racial bloc voting," *see Gingles,* 478 U.S. at 53, 106 S.Ct. at 2768) does not rise to the level of legal significance unless " 'the white majority votes sufficiently as a bloc' to enable it in the absence of special circumstances 'usually to defeat the minority's preferred candidate.' " Grofman, at 211. In the present case, this Court has already determined that plaintiffs have failed to prove that such a pattern of white bloc voting exists. Therefore, it is not truly meaningful to discuss levels of racial polarization, because they have already been determined to be of no legal significance.

*Practices or Procedures that Enhance Opportunities for Discrimination*

1. On the whole, the City of Niagara Falls does not employ practices or procedures that would enhance the possibility of discrimination against African Americans. The undisputed facts show that Niagara Falls has no majority vote or full slate rule. Voters are permitted to vote for any number of available seats. "Single-shot" or "bullet" voting is permitted. Candidates for the City Council do not run for numbered posts or specific seats. No run-off elections are conducted. There is no district residency requirement for at-large candidates.

2. Plaintiffs testified that they have encountered no problems in voting, registering to vote, affiliating with a particular political party, forwarding themselves as candidates, or collecting petitions to be included on the ballot.

3. With the African American percentage of the Niagara Falls population at 13.2%, the staggered election system diminishes African American voters' chances of electing one African American candidate when three or four seats on the City Council are available, compared to when all seven seats are available. Plaintiffs introduced testimony to this effect; however, they did not undertake to demonstrate the particular effects of this principle on Niagara Falls elections. The dilutive effect of the staggered election system was reduced by operation of the 1985 referendum, by which the size of the City Council was increased from four to seven members.

*Denial of Access to Candidate Slating Process*

1. There is no candidate slating process in the City of Niagara Falls.

2. As noted above, the evidence shows that in recent history African Americans have not been discriminated against in registering to vote, casting a ballot, joining a particular political party, forwarding themselves as political candidates, and collecting petitions to be included on a ballot.

3. Plaintiff Bond testified that it is easy to get on the ballot for at-large Board of Education elections.

4. Plaintiffs and other African American citizens in the City of Niagara Falls have been active in City politics and political campaigns. Plaintiff Palmore was appointed deputy treasurer in 1964, and received the approval of the City Council. He is now a Democratic committeeman, and has served as vice-chairman of the Niagara Falls Democratic Committee. He was a ward chairman for a number of years, and was elected by both African American and white committeemen. Palmore noted that the Democratic Committee has had African American committeemen for many years.

5. The Democratic Party endorsed plaintiff Kimble in her 1985 campaign for City Council.

6. Plaintiff Brown has been a Democratic committeeman, and nearly won a seat on the Niagara County Legislature in 1981.

7. Plaintiff Kimble testified that she has been supported by white Democrats, who campaigned with her. Kimble declined to run in the 1989 City Council election.

8. Defendant Quaranto testified that there are no impediments to African Americans running for political office. In 1985, Quaranto himself stayed out of the election for the Niagara County Legislature so as not to interfere with the candidacy of Cecil Perkins, a fellow Democrat and an African American.

9. Defendant Walker, an African American, has served as a Democratic committeeman, as well as a City Councilman.

10. Based on these circumstances, and on the entire record, this Court concludes that the process of becoming a political candidate in the City of Niagara Falls is not characterized by discrimination against African Americans.

*Extent to which African Americans Bear Effects of Discrimination that Hinders their Ability to Participate Effectively in the Political Process*

1. African American residents of the City of Niagara Falls are significantly disadvantaged in the areas of personal and family income, employment, home ownership, vehicle ownership, and higher education, as compared to white residents. For example, the median family income of whites is $28,775, whereas the median family income of African Americans is $15,876. 38.4% of African Americans live below the poverty level, compared to 14.3% of whites. The unemployment rate is 19.3% for African Americans, and 9% for whites.

2. The testimonial proof in this case shows that African Americans in Niagara Falls have in the past suffered various forms of employment discrimination, including the use of separate restroom facilities, disciplinary actions against African Americans, and failure to hire African Americans. In general, employment discrimination has been effected by private employers rather than by officials of the City of Niagara Falls. However, some large employers, such as General Motors, have hired many African Americans. Plaintiffs introduced little testimony indicating the extent to which employment discrimination persists in the City of Niagara Falls.

3. The Niagara Falls Human Rights Commission has established an Affirmative Action Task Force. This Task Force has engaged in a program to increase the number of minority residents who apply and qualify for positions on the Niagara Falls police force and fire department. The Task Force has worked with community organizations. It has sponsored a nine-week training course to assist applicants for the civil service examination. The course was taught by qualified teachers from the Board of Education. The efforts of the Task Force have been largely unsuccessful. Much of its lack of success has resulted from low minority attendance at the training courses.

4. The Task Force also attempted to recruit qualified minority candidates for the police department by visiting colleges, sending out mailings, putting up posters, and distributing handbills.

5. The Niagara Falls Police Department currently has three African American males and four African American females on the force, out of 160 officers.

6. Overall, African Americans constitute less than 10% of the workforce for the City of Niagara Falls in positions that do not involve maintenance. The city has an affirmative action program, through which city administrators hope to raise this number to 15%. The City Council has failed to make permanent many long-term temporary positions filled by African Americans. There are presently no African American department heads employed by the City.

7. The Highland Avenue area of the City of Niagara Falls, which is primarily an African American community, is plagued with crime, particularly drug crimes. At the request of residents, the Police Department has permanently stationed an officer in the

neighborhood, although the officer is frequently called out of the area. The City of Niagara Falls has received grant monies to hire more policemen and firemen. Seven police positions have been approved for "community policing" in African American neighborhoods.

8. A federally-funded Niagara Community Action Program has been established to increase participation by minority residents in community affairs. African Americans have received an equal share of services performed by that organization.

9. Public schools in Niagara Falls have generally been integrated for some time. The Board of Education implemented "Plan 21," its desegregation plan, without the need for a court order. There exists a Magnet School Advisory Committee, which is an integrated committee.

10. The Niagara Falls Board of Education is not an arm or agency of the City of Niagara Falls. The nine members of the Board are elected at-large for five-year terms. The elections are staggered and nonpartisan. There has in recent history been significant African American representation on the Board, including plaintiff Bloneva Bond.

11. The Board of Education employs 1,300 employees, including 670 teachers. Between five and six percent of the teachers employed by the Board are African American. The Board has an affirmative action policy in hiring teachers.

12. The affirmative action program is headed by an African American administrator. The program has sought to increase the percentage of African American teachers in the City. Efforts in this regard have included travelling to African American colleges to recruit qualified African American candidates, advertising in publications targeted to African American readers, and providing time off for employees to take teacher certification classes at Niagara University. Money is available for minority recruiting in the Human Resources Department budget.

13. 21% of those who hold administrative positions on the Board of Education are African Americans.

14. In 1970, the Board voluntarily implemented "Plan 21," a program to desegregate the Niagara Falls city schools. At present, eleven of the thirteen city schools are sufficiently integrated, according to the objectives of the program. According to the program, African American students are bused out of their neighborhoods to attend public schools. There are no public schools in the Highland Avenue area.

15. 28% of the students in the Niagara Falls city schools are African American. 37% percent of the students in special education programs are African American. The same percentage of students in "gifted" classes are African American. White students slightly outscore African American students in school.

16. The Board of Education has established a school for pregnant girls. 60% of the students in that school are white; 40% are African American.

17. Many of plaintiffs' witnesses testified that either they themselves have received considerable advanced education, or they have children that have received such education. Nonetheless, a significantly fewer number of African American residents of Niagara Falls have advanced degrees, compared to white residents.

18. Plaintiffs introduced testimony indicating a past practice by some white guidance counsellors of "steering" African American students away from college preparatory classes. Moreover, two of plaintiffs' witnesses testified that as schoolchildren they had their grades lowered because of their race. However, plaintiffs presented no evidence indicating the extent to which these practices persist.

19. Significantly, plaintiffs' expert historian testified that she found no history of discrimination against African Americans in the area of education.

20. Plaintiffs presented no credible evidence indicating that medical services have been denied to African American residents of Niagara Falls. Plaintiffs' expert historian indicated that she "did very little" research into the provision of health care services to

African Americans. She merely obtained "impressionistic" data from books about health care on a national scale.

21. African Americans have in the past been exposed to discrimination in shopping, selecting hotel facilities, and joining civic organizations such as the YMCA.

22. During the 1950s and 1960s African Americans were largely segregated into certain public housing facilities. Furthermore, African Americans encountered resistance from whites when they attempted to move into white neighborhoods. Much of the school segregation problem in the past was due to segregation in public housing. In recent years, the City has made great strides in integrating those facilities. There is a significant percentage of public housing in the Highland Avenue area of the City, which is largely an African American community. African Americans have relatively little difficulty in obtaining public housing.

23. In 1978, the Niagara Falls City Council enacted a Fair Housing Law. This Law was more stringent than the New York State Human Rights Law because it did not exclude single and two-family dwellings from its provisions.

24. The Niagara Falls Human Rights Commission was established in 1964. It is comprised of eighteen members appointed by the City Council for three-year overlapping terms. It has engaged in organizing fair housing programs and boards. It has attempted to eradicate illicit drug use in public housing developments. African Americans occupy 20% of the positions on the Commission.

25. Niagara Falls has received Community Block Development funds from the federal government. These funds are allocated by vote of the City Council. The funds have been used to develop African American communities in the City. A Minority Business Loan fund was established in 1992, and has provided $75,000.00 per year in loans to African American business owners.

26. The City of Niagara Falls applied to New York State for approval of an economic development zone in an area of the City that includes a high proportion of African American residents, and received approval. The zone created in that area is the only such zone in the City.

27. In 1988, the Niagara Falls City Council enacted Local Law 10, requiring the city to make a commitment to award city contracts to minority-owned businesses. That law was invalidated by virtue of *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

28. Plaintiffs introduced no evidence of significant racial differences in voter registration rates.

29. In the elections analyzed, there were no reliable statistical differences in voter turnout according to race in City Council primary elections. (This was the basis for McDonald's reliance on simple regression analysis.) The evidence indicated significantly lower rates of African American voter turnout in City Council general elections. However, plaintiffs did little if anything during trial to elaborate on and explain the significance of those rates.

*Overt or Subtle Racial Appeals in Political Campaigns*

1. The proof in this case revealed no credible evidence of either overt or subtle racial appeals in any political campaigns in the City of Niagara Falls.

*Extent to which African Americans Have Been Elected to Public Office in Niagara Falls*

1. Prior to 1991, no African American candidate had been elected to the Niagara Falls City Council. In 1991, Andrew Walker was elected to the City Council, and at the time of trial was Chairman of the Council. Although Walker's election occurred after this litigation was commenced, it can be considered in the totality of circumstances.

2. Plaintiffs have portrayed Walker's election as a "special circumstance" because of Walker's outstanding credentials and popularity. Furthermore, plaintiffs have testified that Walker's election was the result of a white campaign to "humiliate" this lawsuit. However, this Court finds no evidence in the record to support this notion, or to indicate that this election is not relevant in determin-

ing whether African American voters presently have an equal opportunity to elect candidates of their choice under the present at-large voting scheme.

3. African Americans have been elected to the Niagara Falls Board of Education in significant numbers. These individuals are Arthur Ray, who won in 1969, plaintiff Bloneva Bond, who won in 1979, and Robert "Knuckles" Bradley, who won in 1985 and 1990. Elections to the Board are at-large and are non-partisan. Board members sit for staggered five-year terms.

4. A significant number of African Americans, including some of the plaintiffs, have been appointed to City boards and commissions. The percentage of African Americans sitting on the boards and commissions highlighted by defendants exceeded the percentage of African Americans in the total population of Niagara Falls.

5. As noted above, African Americans, including a number of the plaintiffs, have held important posts in the Niagara Falls Democratic Party.

*Lack of Responsiveness on the Part of Elected Officials*

1. On the whole, elected officials in the City of Niagara Falls have been responsive to the needs of African American citizens.

2. Much of the evidence that this Court considered in connection with this Senate Report factor is contained in the discussion of the extent to which African Americans bear effects of discrimination in other areas that affect their ability to participate effectively in the political process, *supra.*

3. In the 1960s, the City established the Niagara Falls Human Rights Commission, which was comprised of both whites and African American citizens. This Commission still exists. Plaintiff Bond has been a member of the Commission. However, the Commission has a small staff, shares a secretary with another City agency, and has received criticism for ineffectiveness.

4. As more fully addressed above, the City of Niagara Falls has engaged in efforts to increase the number of minority citizens on its police force and fire department. These efforts have been only marginally successful, due to the failure of minorities to apply for jobs and pass civil service exams.

5. Members of the City Council have adopted an "open-door" policy in their offices, and have made themselves available to discuss the concerns of their constituents, including members of the African American community. Certain councilmen have personally investigated the concerns of their constituents.

6. Defendant Walker considers his role as an African American councilman no different than the roles performed by white councilmen with regard to African American constituents.

*Tenuousness of Policy Underlying the Challenged System*

1. Here, the at-large system of electing members of the City Council is the challenged system.

2. Plaintiffs' testimony revealed that this litigation is largely an attempt by plaintiffs to implement a single-member district system of elections to the City Council. Plaintiffs advocate such a system "as a political theory."

3. The present at-large system was implemented after voters adopted it in a 1985 referendum. Plaintiffs have introduced insufficient evidence to convince this Court that maintenance of the system by the City of Niagara Falls has in any way been premised on a "tenuous" policy. Although plaintiffs testified that they would prefer representatives who would represent their particular neighborhoods, there are obvious advantages to having a City Council comprised of representatives who at least ostensibly represent all the residents of the City.

### CONCLUSIONS OF LAW

1. The Voting Rights Act of 1965, Pub.L. 89–110, 79 Stat. 437, as amended, 42 U.S.C. § 1973 *et seq.* ("the Act") was enacted to enforce the Fifteenth Amendment to the United States Constitution. The Fifteenth Amendment provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or

by any State on account of race, color, or previous condition of servitude." U.S. Const., amend. XV, § 1. *See Chisom v. Roemer,* 501 U.S. 380, 382, 111 S.Ct. 2354, 2357, 115 L.Ed.2d 348 (1991); *Ortiz v. City of Philadelphia,* 28 F.3d 306, 307 (3d Cir.1994).

2. In *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the Supreme Court interpreted Section 2 of the Act to require a plaintiff to prove discriminatory intent in the institution or maintenance of the voting practice being challenged. In response, Congress amended the Act in 1982 to make it clear that a plaintiff need not prove discriminatory intent, and that a violation of Section 2 may be established by showing a discriminatory effect. *Chisom,* 501 U.S. at 394, 111 S.Ct. at 2363. Congress established the "results test" that had been applied by the courts prior to *Bolden. See Thornburg v. Gingles,* 478 U.S. 30, 35 and 44 n.8, 106 S.Ct. 2752, 2758 and 2763 n.8; *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) (articulation of "results test").

3. Section 2 of the Act, as amended, 96 Stat. 134, now provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on a totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision

is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

■ 4. A minority group's "inability to elect representatives of their choice is not sufficient to establish a violation [of Section 2] unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process. The statute does not create two separate and distinct rights." *Chisom,* 501 U.S. at 397, 111 S.Ct. at 2365.

■ 5. In *Gingles,* the Supreme Court established three factors as "necessary preconditions" for a finding that a particular electoral system violates Section 2 of the Act:

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.... Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed ...—usually to defeat the minority's preferred candidate.

*Id.* at 50–51, 106 S.Ct. at 2766–67. *See also Growe v. Emison,* 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993).

■ 6. Establishment of these three threshold requirements does not end the inquiry. After finding that plaintiffs have proven these requirements, the court must proceed to consider the totality of the circumstances based on "a searching practical evaluation of the past and present reality ... and on a functional view of the political process," *Gingles,* 478 U.S. at 45, 106 S.Ct. at 2763–64 (internal quotation and citation omitted), to determine whether the voting scheme "diminishes the minority group's opportunity fully to participate in the political process."

*Jenkins v. Red Clay Consol. Sch. Dist.,* 4 F.3d 1103, 1115 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2779, 129 L.Ed.2d 891 (1994). This consideration involves a "fact-bound, intensely local inquiry." *Overton v. City of Austin,* 871 F.2d 529, 532 (5th Cir.1989).

■ 7. In this regard, the Senate Judiciary Committee majority report accompanying the bill that amended Section 2 enunciates additional circumstances that are probative of a violation of Section 2:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group [and]

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite or procedure is tenuous.

S.Rep. No. 97–417, 97th Cong. 2d Sess. 28, 28–29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206–07. "These factors were derived from the analytical framework of *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), as refined and developed by the lower courts, in particular by the Fifth Circuit in *Zimmer v. McKeithen,* 485 F.2d 1297 (1973) (en banc), *aff'd sub nom., East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) *(per curiam)." Gingles,* 478 U.S. at 36 n.4, 106 S.Ct. at 2759 n.4.

■ 8. The most important of these "Senate Report" factors are "the extent to which minority group members have been elected to public office in the jurisdiction," and the "extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles,* 478 U.S. at 48 n.15, 106 S.Ct. at 2765 n.15 (quoting S.Rep. at 28–29 No. 97–417). If present, the other factors "are supportive of, but *not essential to,* a minority voter's claim." *Id.*

■ 9. If the court determines that plaintiffs have established the "necessary preconditions" to a finding of a Section 2 violation, the court should proceed to consider the additional Senate Report factors. However, the Supreme Court was careful to indicate that "[w]hile the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered." *Gingles,* 478 U.S. at 45, 106 S.Ct. at 2763. Moreover, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* (quoting S.Rep. at 29 No. 97–417).

■ 10. The use of an at-large voting scheme by a jurisdiction is not a *per se* violation of the Act. *Id.* at 48, 106 S.Ct. at

2765; *Whitcomb,* 403 U.S. at 142, 91 S.Ct. at 1868. However, "[w]here members of a racial minority group vote as a cohesive unit, practices such as ... at-large electoral systems can reduce or nullify minority voters' ability, as a group, 'to elect the candidate of their choice.'" *Shaw v. Reno,* 509 U.S. 630, ——, 113 S.Ct. 2816, 2823, 125 L.Ed.2d 511 (1993) (quoting *Allen v. State Bd. of Elections,* 393 U.S. 544, 569, 89 S.Ct. 817, 833, 22 L.Ed.2d 1 (1969)). The Supreme Court has "stated on many occasions that multimember districting plans, as well as at-large plans, generally pose greater threats to minority-voter participation in the political process than do single-member districts." *Growe,* 507 U.S. at 40, 113 S.Ct. at 1084. It is incumbent upon plaintiffs to "prove that the use of [an at-large scheme] operates to minimize or cancel out their ability to elect their preferred candidates." *Gingles,* 478 U.S. at 48, 106 S.Ct. at 2765.

■ 11. "A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim...." *Id.* at 56, 106 S.Ct. at 2769.

■ 12. In general, legally significant white bloc voting exists where the white bloc vote normally will defeat the combined strength of minority votes plus white "crossover" votes for minority-preferred candidates. *Id.* at 56, 106 S.Ct. at 2769.

■ 13. Some of the factors that should be considered in determining the degree of white bloc voting that can minimize or cancel minority voters' ability to elect representatives of their choice are: "the nature of the allegedly dilutive electoral mechanism [here, the at-large system]; the presence or absence of other potentially dilutive electoral devices, such as majority vote requirements, designated posts, and prohibitions against bullet voting [here, there are none except staggered elections for City Council]; the percentage of registered voters in the district who are members of the minority group [here, African Americans constitute 13.2% of the voting age population in Niagara Falls;

plaintiffs offered no evidence of the percentage of registered voters who are African American]; the size of the district [here, there is one at-large district]; and, in multimember districts, the number of seats open and the number of candidates in the field [here, the numbers differ from election to election, as discussed above]." *Id.*

■ 14. [A] pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election. *Id.* at 57, 106 S.Ct. at 2769.

■ 15. More recent elections are more probative in discerning the discriminatory present effects of the electoral standard, practice, or procedure under scrutiny.

16. The most relevant elections in this case are the primaries and general elections for the Niagara Falls City Council.

■ 17. "[T]he election of a few minority candidates 'does not necessarily foreclose the possibility of dilution of the black vote.' If it did, the possibility exists that the majority citizens might evade the section, e.g., by manipulating the election of a 'safe' minority candidate." S.Rep. No. 97–417 at 29 n.115.

■ 18. Elections held after the commencement of litigation may be relevant in resolving a racial vote dilution claim; however, the court must be sensitive to "evidence that the pendency of litigation ... led to unusual support for minority-preferred candidates by whites seeking to maintain the at-large system." *Valladolid v. City of National City,* 976 F.2d 1293, 1298 (9th Cir.1992). *See also Collins v. City of Norfolk,* 883 F.2d 1232, 1242 (4th Cir.1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990) (concluding that "the election of a second [African American] councilman ... was the result of special circumstances and should not [have been] dispositive in determining whether Norfolk's at-large voting for a multimember council dilute[d] [African American] voting power").

19. "[T]he race of the candidate *per se* is irrelevant to racial bloc voting analysis.... [T]he fact that race of voter and race of candidate is often correlated is not directly pertinent to a § 2 inquiry. Under § 2, it is the *status* of the candidate as the *chosen representative of a particular racial group,* not the race of the candidate, that is important." *Gingles,* 478 U.S. at 68, 106 S.Ct. at 2775 (Brennan, J. plurality opinion).[12] *See also Sanchez v. Bond,* 875 F.2d 1488, 1495 (10th Cir.1989), *cert. denied,* 498 U.S. 937, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990); *Valladolid,* 976 F.2d at 1297; *Jenkins,* 4 F.3d at 1124–31; *Williams v. State Bd. of Elections,* 696 F.Supp. 1574, 1580–81 (N.D.Ill.1988); *Clarke v. City of Cincinnati,* 1993 WL 761489 (S.D.Ohio 1993).

20. Plaintiffs' expert witness McDonald, at least in theory, embraced the principle that "[r]ace is a factor for the voter, but not for the candidate."

21. The Voting Rights Act seeks to ensure that minority voters have an equal opportunity to elect candidates of their choice and to participate meaningfully in the political process. It does not guarantee that minority candidates will be elected to a particular governmental body, or even that any particular minority candidate will have an equal opportunity to be elected, regardless of his or her political party affiliation, name recognition, and qualifications in relation to other candidates. Although the statistical and testimonial proof may show that minority voters prefer minority candidates, such a preference will not be presumed.

22. A legal standard that categorically precludes analysis of elections in which no minority candidate contested—based on the presupposition that only a minority candidate can truly be a "candidate of choice" of minority voters—would presume that "communities seek not the best representative but the best racial ... partisan." *Shaw v. Reno,* —— U.S. at ——, 113 S.Ct. at 2827–28. As such, it would be "at war with the democratic ideal,

[and] should find no footing here." *Id.* at ——, 113 S.Ct. at 2827–28.

23. It is particularly appropriate that such a standard should find no footing in the present case, because there is no indication in the record that the white candidates who have been elected with the support of the African American community in Niagara Falls have not truly been the chosen candidates of African American voters. In *Sanchez,* the Tenth Circuit rejected any *per se* rule that elections in which only white candidates ran cannot be relevant. Rather, the court wrote:

> Such elections may be relevant and can be used to discern whether racially polarized voting exists and to measure the success of minority preferred candidates, so long as one of the Anglo candidates can be considered a preferred candidate of the minority group. As with other types of relevant evidence, the district court has a right to consider these elections and to give them such weight as the circumstances warrant.

*Sanchez,* 875 F.2d at 1495.

24. In *Jenkins,* the Third Circuit explained that "there may be majority candidates who truly may be the minority community's representative of choice." *Jenkins,* 4 F.3d at 1125. The court suggested that, in general, "elections involving white candidates only are much less probative of racially polarized voting than elections involving both black and white candidates." *Id.* at 1128 (citing *Westwego Citizens for Better Gov't v. City of Westwego,* 946 F.2d 1109 (5th Cir. 1991)); however, it approved of the "flexible approach" taken by the Tenth Circuit in *Sanchez.* The Third Circuit discussed a number of factors that the court should consider in determining whether a white candidate is "truly the minority community's representative of choice." *Jenkins,* 4 F.3d at 1126. According to *Jenkins,* the factors include: (1) whether the minority community "sponsored" the white candidate, e.g., whether the minority group initially advanced the candidate and participated in and financed the candidate's campaign; (2) whether the candi-

---

**12.** In *Gingles,* the Supreme Court employed its three-pronged analysis by reviewing only the results of elections in which an African American candidate contested. However, those were the only elections analyzed by the parties in that case.

date gave attention to the particular needs of the minority community, and whether the candidate campaigned in the minority community; (3) turnout rates in which only white candidates contested; and (4) the extent to which minority candidates have run for political office in the jurisdiction, and the ease or difficulty with which minority candidates can qualify to run. *Id.* at 1129.

25. In making such a practical evaluation of the political realities of the jurisdiction, it is appropriate for the court to consider the testimony of plaintiffs and elected representatives indicating how the representatives should and do serve minority citizens. *See Collins*, 883 F.2d at 1238. Although "[s]poradic lay testimony ... is less indicative of black voters' voting patterns generally than the regression analysis," *Jenkins*, 4 F.3d at 1127 (citing *Gomez v. City of Watsonville*, 863 F.2d 1407, 1416 (9th Cir.1988), *cert. denied*, 489 U.S. 1080, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989)), plaintiffs' explanations of how they select, sponsor, and support certain candidates may be highly relevant in determining who were the minority's candidates of choice, and which elections are relevant in evaluating the minority's ability to elect those candidates.

26. In the present case, this Court cannot ignore the narrative testimony offered by plaintiffs themselves emphasizing that, as far as the plaintiffs in this case are concerned, the race of the candidate is not a factor in their determination of their candidates of choice. Plaintiffs stressed emphatically and repeatedly that the race of the candidate is not important to them. Plaintiff Bond professed such a conviction during her testimony, and indicated that she has failed to support certain African American candidates in the past. Plaintiff Palmore testified that the race of the candidate running was unimportant to him, and that he simply preferred "a person of my own choice." Palmore expressed his preference for single-member districts "as a political theory." Plaintiff Brown provided similar testimony, and indicated further that elections to City Council have not involved "black-issue, white-issue" campaigns. Plaintiff Kimble testified that the election of a minority candidate was not the focus of this litigation. She stated that she did not care whether the candidate was "male or female, white, red, black, yellow, or brown, as long as the person is responsive to the needs of the district and will be accountable to the constituency that he or she represents." Kimble also testified to her belief that a plaintiff can sue under the Voting Rights Act to compel district representation as being simply a better form of government than at-large representation.

27. Plaintiffs also testified that they have sponsored white candidates. Plaintiff Palmore testified that the Niagara Improvement Association, of which most plaintiffs are members, has supported whites and African Americans, Democrats and Republicans, for the offices of city councilman, treasurer, and judge. When asked about the type of support given to these candidates, Palmore testified that the Association provided financing, collected petition signatures, campaigned, participated in voter registration drives, and transported voters to the polls. Palmore testified that he himself has worked for Democrats, "black or white."

28. Similarly, plaintiff Brown testified that he has worked hard in the past for white candidates. He specifically testified that Quaranto has obtained substantial support in the African American community, and that African Americans have supported Quaranto because he listens to their concerns. This testimony is reinforced by the statistical proof offered by defendants.

29. Quaranto testified that he received support from African American voters in the 1985 and 1989 races for City Council, and in his 1991 Mayoral campaign. Quaranto stated that he received support particularly from Kimble, Walker, Fields, Doris Jones, Pauline Walker, and Ray: all African Americans. Quaranto testified that he generally received support from members of the African American community, including plaintiff Brown, ex-

cept in 1981 when Brown opposed Quaranto in a race for the Niagara County Legislature. Quaranto testified that African American citizens would walk him through African American neighborhoods to conduct door-to-door campaigning.

30. As discussed above, African American voters in the City of Niagara Falls have an equal ability to participate in political organizations, and to forward African American political candidates. No voting practices or procedures exist that bar entry to the political process, including the opportunity to run for political office. African Americans, such as Arthur Ray and plaintiffs Bond and Kimble, have regularly run for political office in Niagara Falls, and have not encountered difficulty qualifying to run.

31. Furthermore, no evidence was introduced to show that African American candidates ran on platforms that were targeted specifically to African American voters, or were substantially different than the platforms of the other candidates who ran on their slate. For instance, plaintiff Kimble ran in the 1987 City Council Democratic primary on a unified Democratic platform, and campaigned together with the other Democratic candidates.

32. Moreover, the facts in the present case show that, in at least one election in which an African American candidate has contested, African American voters have not preferred that candidate.

33. Plaintiffs have introduced certain statistical evidence showing that African American voters in the City of Niagara Falls tend to vote cohesively in favor of African American candidates in those instances where an African American candidate is contesting an election, and that African American voter turnout declines where no African American candidate contests. However, the proof also shows that high levels of African American voter cohesion often exist in elections in which no African American candidate contested.

34. Based on all these factors, this Court finds no reason to discount elections in which no African American candidate contested in determining whether plaintiffs have established a prima facie case under Section 2 of the Act, according to the strictures of *Gingles*.

35. The decision not to exclude categorically from the analysis all elections in which no minority candidate contested does not diminish the relevance of the extent to which members of the minority group have been elected to political office in the jurisdiction: one of the most salient Senate Report factors.

### ULTIMATE CONCLUSIONS

Plaintiffs have established the first two prongs of a prima facie case under Section 2 of the Voting Rights Act, according to *Gingles*. However, they have failed to establish the third prong; that is, they have failed to prove by a preponderance of the evidence that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . .—usually to defeat the minority's preferred candidate." *Id.* at 50, 106 S.Ct. at 2766–67. Therefore, plaintiff's claim under the Act must fail.

Furthermore, even if this Court were to assume that plaintiffs have established a prima facie case, the totality of circumstances, including the political realities of the City of Niagara Falls discussed above, does not suggest that the at-large system of electing members to the Niagara Falls City Council being challenged by plaintiffs is "not equally open to participation by [African Americans] in that [African Americans] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). Therefore, plaintiffs' claim under § 2 of the Act must fail, and judgment must be awarded to defendants.

## APPENDIX A
### Table 2C: Data Used as the Basis of Calculations of whether the Black Population or VAP in the Wilson District is of Sufficient Size

| ELECTION | Candidate | "Best" Estimate of Turnout Rate | | Simple Reg. Support Level | |
|---|---|---|---|---|---|
| | | White | Black | White | Black |
| '75 Mayoral Primary | Profit | 14.1 | 12.6 | 1.4 | 47.4 |
| '77 Council Primary | Profit | 8.8 | 9.5 | 8.3 | 72.7 |
| | Mathews | (same as above) | | 5.2 | 68.3 |
| '79 Council Primary | Mathew | 10.9 | 10.5 | 7.3 | 88.0 |
| '82 Lt. Gov. Primary | McCall | 6.8 | 7.0 | 39.2 | 96.7 |
| '85 Proposal 7 Districts | — | 23.9 | 6.5 | 36.8 | 67.6 |
| '85 Proposal 6 Districts | — | 22.1 | 6.0 | 28.5 | 47.2 |
| '87 Council Primary | Kimble | 19.1 | 20.8 | 29.0 | 92.2 |
| '87 Council General | Kimble | 39.8 | 27.1 | 7.9 | 57.0 |
| '88 Pres. Primary | Jackson | 12.9 | 25.2 | 10.9 | 113.7 |
| '91 Council Primary | Walker | 20.8 | 21.0 | 38.6 | 79.4 |
| '91 Mayoral Primary | Kimble | 20.5 | 20.5 | 8.1 | 93.9 |
| '91 Council General | Walker | 41.5 | 23.6 | 42.9 | 84.8 |

The "best" turnout estimates for all primary elections, except Jackson in 1988, are those from the "neighborhood only" calculations (see Table 1C). The general election and Jackson primary "best" turnout estimates are the average of the "neighborhood only" and double regression calculations. From 1975 through 1982 these estimates are from analysis using the 1980 population data. From 1985 through 1991, the estimates are based on analysis using the 1990 VAP data.

The simple regression estimates of support levels by race are based on analyses using the 1980 population data for the 1975 through 1982 period and on analyses using the 1990 VAP data for the 1985 through 1991 period.

## APPENDIX B
### Re-report of the Estimated Vote Percentage for Black Voters Most Preferred Candidate in Niagara Falls Elections Under the Racial Polarization and Turnout Patterns Estimated for City-wide Elections and Assuming Election Takes Place in a Hypothetical Black Majority District with 64.3 Black Population or 60.6 Black Voting Age Population

SOURCE: Pl. Exhibit # 25, pp. 23 and 24 (also Pl. Exhibit 25E)

1975–91 PRIMARIES

| | | | |
|---|---|---|---|
| 1975 Mayor | Profit | 29.8 | (using 64.3 black population) |
| 1977 Council | Profit | 50.8 | (using 64.3 black population) |
| | Mathews | 45.3 | (using 64.3 black population) |

| | | | |
|---|---|---|---|
| 1979 Council | Mathew | 58.5 | (using 64.3 black population) |
| 1982 Lt. Gov. | McCall | 73.5 | (using 64.3 black population) |
| 1987 Council | Kimble | 68.6 | (using 60.6 black VAP) |
| 1988 President | Jackson | 88.0 | (using 60.6 black VAP) |
| 1991 Mayor | Kimble | 59.9 | (using 60.6 black VAP) |
| 1991 Council | Walker | 68.4 * | (using 60.6 black VAP) |

*and wins at-large

SOURCE: Pl. Exhibit # 25, pp. 20 and 23

GENERAL ELECTION

| | | | |
|---|---|---|---|
| 1987 Council | Kimble | 33.0 | (using 60.6 black VAP) |
| | G'citano [1] | 28.9 | (using 60.6 black VAP) |
| 1991 Council | Walker | wins at-large | |

SOURCE: Pl. Exhibit # 25, pp. 20 and 23

1985 REFERENDA

| | | | |
|---|---|---|---|
| 7 Districts | | 48.4 | (using 60.6 black VAP) |
| 6 Districts | | not polarized | |

SOURCE: Pl. Exhibit # 24, pp. 11 and 13

1969 & 1971 COUNCIL ELECTIONS

| | | | |
|---|---|---|---|
| 1969 General | Abrams | not polarized | |
| 1971 Primary | Ray | 69.7 | (using 64.3 black population) |
| 1971 General | Ray | 43.9 | (using 64.3 black population) |
| | Beswick [2] | 22.9 | (using 64.3 black population) |

[1] Geracitano, a white candidate, is the leading vote recipient among Republican candidates in the 1987 general election for Council and therefore is taken as a hypothetical Republican opponent in an SMD.

[2] Beswick, a white candidate, is the leading vote recipient among Republican candidates in the 1971 general election for Council and therefore is taken as a hypothetical Republican opponent in an SMD.

---

### ORDER

IT HEREBY IS ORDERED that this Court finds in favor of defendants on plaintiffs' claim under § 2 of the Voting Rights Act, 42 U.S.C. § 1973.

FURTHER, that the Clerk of the Court shall enter final judgment in favor of defendants and against plaintiffs.

SO ORDERED.